## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| IN THE MATTER OF THE ) | |
| ADMINISTRATIVE INSPECTION ) | |
| ) | Case No. 23-mj-04459-DHH |
| In re:  MICROFAB, INC. (FORMER) ) | |
| SUPERFUND SITE, ) | |
| 104 - 106 Haverhill Road, ) | |
| Amesbury, Massachusetts ) | |
| ) | |

### AFFIDAVIT OF LISA THUOT

The undersigned, being duly sworn, deposes and says:

1.      I make this Affidavit in support of the United States' *Ex Parte* Application for

Three-Year Extension of Administrative Warrant Pursuant to CERCLA Section 104(e), so that

EPA may continue to enter an approximately 13.8-acre property, located at 104-106 Haverhill

Road, Amesbury, Essex County, Massachusetts (Tax Map 73, Lot 43) (the "Property"), within an

area known as the Microfab, Inc. (Former) Superfund Site ("Site"), in order to complete the

performance of an ongoing remedial investigation and feasibility study ("RI/FS") and to

determine how to respond to past releases and the threat of future releases of hazardous

substances at the Site, under Section 104 of the Comprehensive Environmental Response,

Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9604.

2.      The statements in this affidavit are based on my personal knowledge; my

experience at the United States Environmental Protection Agency ("EPA"), including as a Field

Investigator with the Laboratory Services and Applied Science Division, where I conducted

sampling and investigations work at over 30 Superfund removal and remedial sites; my

experience as a Remedial Project Manager, performing project management work at four

Superfund sites; and knowledge I have gained from being the Remedial Project Manager for the

Microfab Site, from reviewing EPA files concerning this Site, from reviewing publicly available information, and from discussions with representatives of EPA, the Massachusetts Department of Environmental Protection ("MassDEP"), and the City of Amesbury.

3.      I am employed as a Remedial Project Manager in the Superfund and Emergency Management Division in EPA Region 1 (formerly known as the "Office of Site Remediation and Restoration"), in Boston, Massachusetts.  I have been employed by EPA for approximately 22 years and have been in my current position as a Remedial Project Manager since November 27, 2016.  Previously, I was a Compliance Inspector and Field Investigator in the EPA Region 1 Laboratory Services and Applied Science Division (formerly known as "the Office of Environmental Measurement and Evaluation"), located in Chelmsford, Massachusetts.

4.      My education includes a Bachelor of Science degree in Environmental Geoscience from the University of Massachusetts, which I earned in 2003.

5.      As a Remedial Project Manager, I am authorized by EPA, under 40 C.F.R. § 300.135, to direct response actions at facilities where a release or threat of release of hazardous substances, pollutants, or contaminants exists.  My responsibilities include conducting inspections and investigations to determine the nature and extent of the contamination caused by such release and conducting investigations and studies to determine remedial alternatives to address the risk posed to human health and the environment.  In carrying out these responsibilities, I consult and coordinate with state and local agencies such as MassDEP.

6.      As part of my duties as a Remedial Project Manager for EPA, I review documents maintained by EPA and by state and local agencies, and I speak with employees of EPA and of state and local agencies, and with the public, in order to gather pertinent facts about releases and threats of release, conditions at affected properties, and persons who are potentially responsible

for such releases or threatened releases, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675.

7.      On September 9, 2016, based on a Hazard Ranking System score, EPA published a proposal in the *Federal Register*, 81 Fed. Reg. 62428, that the Site (including the Property) be added to the National Priorities List, 40 C.F.R. Part 300, App. B ("NPL").  On August 3, 2017, after a public notice and comment period, EPA added the Microfab Site to the NPL and published a notice of the listing in the *Federal Register*, 82 Fed. Reg. 36095.

8.      The NPL is a list of national priorities for addressing the most contaminated hazardous waste sites in the United States.  The list is required by Section 105(a)(8)(B) of CERCLA, 42 U.S.C. § 9605(a)(8)(B), and set forth in Appendix B of the National Contingency Plan, 40 C.F.R. Part 300.  Section 105(a)(8)(B) defines the NPL as a list of "releases" and the highest priority "facilities," and requires that the NPL be revised at least annually.  The NPL is intended primarily to guide EPA in determining which sites warrant further investigation to assess the nature and extent of public health and environmental risks associated with a release of hazardous substances, pollutants or contaminants.

9.      On August 15, 2018, in Case No. 18-mj-4223-DHH, this Court granted the United States' *ex parte* application for an administrative warrant allowing EPA to access the Property for up to three years, until August 15, 2021, to conduct a removal site evaluation and an RI/FS at the Site.  By that date, EPA completed the removal site evaluation and made progress on the RI/FS, but did not complete the RI/FS.  Therefore, on August 10, 2021, in Case No. 21-mj-4228-DHH, the United States applied *ex parte* for two years of additional access to the Site, in order to complete the RI/FS.  During that time EPA made progress on the RI/FS, but did not complete it.  Accordingly, now, EPA anticipates that it will need additional time to complete the RI/FS.

10.     In Paragraph 43 of my affidavit supporting the United States' 2021 *ex parte*

application for a warrant for two additional years of access to complete the RI/FS, attached

hereto as Exhibit ("Ex.") A, I noted that delays in the RI/FS could result from a new EPA

contracting system or other, unforeseen circumstances:

> If the results of the extended RI/FS investigations and studies indicate that a
> remedial action is necessary, EPA may need access to the Property for additional
> time to perform this cleanup work. In that case, EPA may seek a further extension
> of the access warrant or other appropriate order allowing the agency to access the
> Property to conduct the selected remedial activities. Thus, while the United States
> knows now that EPA needs at least two more years to complete the RI/FS, it is
> not seeking additional time to perform a remedial action, unless and until it
> determines that such a cleanup is necessary based on the results of the RI/FS.

11.     While EPA has not yet completed the RI/FS, it has performed enough additional

investigation and study to determine that a remedial design and remedial action ("RD/RA") will

be necessary.

12.     Therefore, now, EPA seeks three years of additional time to access the Property to

complete the RI/FS, including Site risk assessments, RI report, FS report, Site maintenance (e.g.,

snow plowing, vegetation maintenance, fence repairs), disposal of investigation-derived waste,

and Site demobilization activities, and to commence a remedial design ("RD").  Based on the

RI/FS performed to date, EPA has determined that the RD should include at least the following

activities at the Property:  mobilization; periodic Site visits to gain familiarity with

contamination issues and logistical needs; periodic maintenance, such as snowplowing,

vegetation maintenance, fence repairs, to keep the Property accessible and secure; a pre-design

investigation, including additional data collection, if needed to support the remedy design; field

treatability studies, to test potential remedy components; disposal of investigation-derived waste,

including hazardous and non-hazardous wastes generated during RD field activities; and demobilization.

13.     This extension is necessary because of delays in the RI/FS process stemming primarily from two factors:

        a.   First, as a result of the COVID-19 pandemic, EPA and its Site environmental contractor experienced labor shortages, disruptions in field equipment availability, and shortages of materials and supplies, which led to delays in remedial work.  For example, EPA's contractor was unable to schedule a qualified drilling subcontractor in a timely manner, which caused delays in critical subsurface drilling and well installation work.

        b.   Second, due to COVID-related staff absences, a laboratory in the EPA Contract Laboratory Program network did not analyze certain samples within allowable hold times, which rendered important groundwater and surface water sampling data unusable. Therefore, EPA contractors had to re-collect and re-analyze sampling data, which required substantial additional field time and effort.

14.     EPA regulations define remedial investigation as a process undertaken to determine the nature and extent of the problem presented by a release of a hazardous substance, pollutant or contaminant, including whether such release may present an unacceptable risk to human health and/or the environment.  40 C.F.R. § 300.5.  A remedial investigation is generally performed concurrently and in an interactive fashion with a feasibility study.  A feasibility study is a study undertaken to develop and evaluate options for remedial action ("RA").  *Id*.

15.     Under Section 104 of CERCLA, 42 U.S.C. § 9604, EPA is authorized to conduct investigations, monitoring, surveying, testing, and other information gathering that EPA deems necessary or appropriate, where EPA has reason to believe there has been or is about to be a

release of a hazardous substance, pollutant, or contaminant.  EPA may perform such an investigation or other response activity if EPA deems it necessary or appropriate to identify the existence or extent of the release or threat of release, the source or nature of a released hazardous substance, pollutant or contaminant, or the extent of the associated risk posed to public health or welfare, or the environment.  *Id.*

16.     To complete the RI/FS and to initiate and conduct RD activities, EPA will need continued access to the Property.  The geographic coordinates for the Property are approximately 42°50'32.62" north latitude and 70°57'35.43" west longitude.  Quitclaim Deed, from Samuel and Florence Mead to Microfab, Inc. ("Microfab"), Book 5404, Page 701, Essex County Registry of Deeds, Southern District (11/3/1966) ("1966 Deed") (Ex. B); EPA, "HRS [Hazard Record System] Documentation Record" (Sept. 2016) ("HRS Record") (Ex. C), at 2, 20; City of Amesbury, Assessors Maps 73 and 84 (Ex. D).

17.     The Property includes a three-story abandoned factory building, constructed in or about 1950 of brick, corrugated steel, and concrete block.  The building is approximately 102,768 square feet and sits on a concrete foundation with a full basement.  The building is in poor condition, with damaged structural integrity, including problems such as roof leaks and floor collapse in some areas, as reported by MassDEP and its contractors.

18.     An unnamed stream, which runs by the western side of the Property, drains into a large wetland to the south, which is connected hydrologically to the Merrimack River. A tributary of that stream runs from east to west along the southern border of the Property.

19.     The Property is located in a mixed commercial, industrial, and residential area. The Property is bounded to the north by Haverhill Road (a/k/a Highway 110), to the east by woodlands and a commercial property, to the west by the unnamed stream described above and

by another commercial property, and to the south by woodlands, the above-referenced tributary, and a large wetland.  The residential properties nearest to the Property are located to the north, immediately across Haverhill Road, near its intersection with Kimball Road; and 0.25 miles to the south, off of Middle Road.

20.     Microfab acquired the Property on November 3, 1966, by quitclaim deed recorded in Book 5404, Page 701, with the Essex County Registry of Deeds, Southern District. 1966 Deed (Ex. B).

21.     Microfab used the Property for the manufacture of printed circuit boards, electroplating, and other metal finishing operations, from approximately May 1967 to October 1987.  During that time, it appears from my review of the historical record that Microfab used the Property for the disposal and treatment of wastes, some of which contained hazardous substances.  Historical documentation indicates that there have been four main sources of contamination at the Property:  (1) discharges of untreated or improperly treated manufacturing wastes from the Microfab metal finishing facility to the unnamed stream and wetlands at the Site; (2) contaminated soils from spills and releases; (3) improper waste management practices; and (4) dry wells and leach fields that released contaminants to the subsurface.  EPA, "Final Site Reassessment Report for Microfab, Inc. (Former), Amesbury, MA" (December 2015) ("Site Reassessment Report") (Ex. F), at 4, 8, 13; HRS Record (Ex. C), at 10 Fig. 3 (Source Nos. 1 & 2 Sampling Locations), 20, 23, 31, 42.  "Dry wells" are underground tanks or structures used to discharge wastewater into the ground, and "leach fields" are a network of underground perforated pipes and gravel trenches that received wastewater from a septic tank.  *Id.*

22.     Manufacturing operations on the Property ceased in or about 1987, and the Property has been unoccupied since that time.  HRS Record (Ex. C), at 20; City of Amesbury,

Massachusetts, Assessors Card (2023) (Ex. E); City of Amesbury, Assessor's Office, on-line

property database, entry for "104 Haverhill Rd," currently available at

http://gis.vgsi.com/amesburyma/Parcel.aspx?Pid=5180.

23.     In October 1987, Microfab filed for bankruptcy, under Chapter 7 of the

Bankruptcy Code.  Microfab was dissolved involuntarily in December 1990.  Massachusetts,

Secretary of the Commonwealth, Corporations Division, Business Entity Summary, ID No.

042319604 (Microfab, Inc.) (Ex. G).

24.     Microfab was at one time a wholly owned subsidiary of Semicon, Inc., which was

itself dissolved in or about 2007.  Massachusetts, Secretary of the Commonwealth, Corporations

Division, Business Entity Summary, ID No. 042242662 (Semicon Inc.) (Ex. H); Letter from

Robert House of Semicon, Inc. to Thomas McMahon of MA Division of Water Pollution

Control, dated Nov. 14, 1975 (Ex. I) (referring to Semicon, Inc. as "the parent company" of

Microfab).

25.     Microfab and Semicon, Inc. have not paid local property taxes in connection with

the Property since 2005, at the latest.  According to the City of Amesbury, as of February 2016,

the back taxes owed to the City for the Property exceeded $800,000.  Letter from Thomas

Barrasso, Director of Energy and Environment, City of Amesbury, to William Scott, Director of

Office of Community and Economic Development, City of Amesbury, dated Feb. 2, 2016

(Ex. J).

26.     Microfab is listed in the City of Amesbury Assessor's Office property database as

the owner of the Property.  City of Amesbury, Assessor's Office, on-line property database, entry

for "104 Haverhill Rd," currently available at

http://gis.vgsi.com/amesburyma/Parcel.aspx?Pid=5180.

27.     Based on my review of EPA and MassDEP records, the information gathered by EPA during the performance of the RI/FS to date, and my experience as a Compliance Inspector and Remedial Project Manager for EPA, I conclude there is a reasonable basis to believe that there may be a release or threatened release of a hazardous substance or pollutant or contaminant at or from the Microfab Property.

28.     Between 1967 and 2015, the City of Amesbury, MassDEP, and EPA conducted investigations of the Property.  In samples collected from groundwater, surface water, sediment, and shallow soils at the Property, investigators found hazardous substances, including volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), cyanide, and heavy metals.  Investigators also found VOCs and heavy metals in the unnamed stream and the wetland south of the Property.  HRS Record (Ex. C), at 21-25, 31-38, 44-82; Site Reassessment Report (Ex. F), at 15-16, Table 8, 30, 34, 41.

29.     In samples of surface water and sediments at the Property, collected during a Site inspection by an EPA contractor in 2015, investigators found VOCs, heavy metals, SVOCs, and cyanide at concentrations at least three times greater than background levels.  HRS Record (Ex. C), at 22; Site Reassessment Report (Ex. F), at 18-29; 35.  Groundwater samples, collected by MassDEP contractor Clean Harbors from Site monitoring wells in 2013, indicate exceedances of the Massachusetts Contingency Plan groundwater standards for certain VOCs, including trichloroethylene ("TCE"), cis-1,2-dichloroethylene ("cis-1,2-DCE"), 1,1-dichloroethene, trans-1,2-,dichloroethene, and vinyl chloride.  Site Reassessment Report (Ex. F), Tbl. 8, 30.  During Phase I of the EPA remedial investigation, conducted from 2019-2020, EPA's contractor

collected samples of soil, sediment, groundwater, surface water, and pore water[1] on the Microfab

property and in adjacent off-Site areas.  Analytical results from the soil and sediment samples

confirmed the presence of heavy metals such as arsenic, chromium, and lead, in addition to TCE

and cyanide.  Analytical results from groundwater samples confirmed the presence of elevated

levels of VOCs, including TCE, cis-1,2-DCE, and vinyl chloride, consistent with previous

investigations.  All of the contaminants referenced above are hazardous substances under

CERCLA and its implementing regulations, 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4.

30.     Based on my review of EPA and MassDEP records, including those cited above,

and my experience as a Compliance Inspector and Remedial Project Manager for EPA,

I conclude that EPA's completion of RI/FS work on the Property is needed to fully characterize

and delineate the nature and extent of contamination at the Site, the risk such contamination

presents to human health and the environment, and the remedial action needed to address such

risks, and commencement of an RD on the Property is needed to further characterize the nature

and extent of a remedial action ("RA") needed to address the voluminous hazardous substances

on and below the surface of the Property and the Site, and the time required for such an action.

31.     The Property has been abandoned since 1987, and despite efforts to improve

security, trespassers and vandals, including area residents and children, have accessed the

Property and could be exposed to contaminants there.  The building is in poor condition, with

damaged structural integrity, including problems such as roof leaks and floor collapse in certain

areas.  In 2019, EPA added a new perimeter fence to secure the property, including new entrance

---

[1] A "pore water sample" is a sample of water contained in the pores or spaces of saturated sediment (*i.e.*, rock fragments, sand, silt); the data is used to estimate contaminate flux from sediments into the overlying surface water, and to determine contaminant concentrations within the biologically active surficial layer of sediments.

gates and signage that identifies the Property as an EPA Superfund Site at which there should be

no trespassing.  EPA has barricaded several openings into the former factory building with

plywood.  Nevertheless, trespassers have periodically entered the building by breaching

barricades, cutting holes in the perimeter fence, and scaling the building and entering via the

roof.  The City of Amesbury stated that it has attempted to barricade the building doors in the

past, but the City also has not been successful in keeping out trespassers.  Since manufacturing

operations at the Property ceased, the City of Amesbury Police Department has responded to

several fires and other incidents on the Property.

32.     The goal of the RI/FS is to characterize and delineate the nature and extent of

contamination at the Site, fill in data gaps, perform human health and ecological risk

assessments, and understand the conditions at the Site, so EPA can formulate and evaluate

potential remedial alternates for the Site (including the Property).  As part of the RI/FS effort,

and during certain RD activities, such as a pre-design investigation or treatability studies, EPA

will need to continue periodically collecting samples of soil, sediment, groundwater, and surface

water, and may need to conduct drilling operations to install new monitoring wells, on the

Property.  In addition, EPA will need to continue to temporarily maintain equipment and

sampling-related materials, such as soil, sediment, and water sampling containers and supplies,

and waste storage containers, hazardous substances, and building debris, on the Property.  To

support its investigations and analyses, EPA will likely continue to take photographs or videos of

the performance of the RI/FS and of the Property's evolving condition.  All of these activities are

typical elements of an RI/FS or a RD under CERCLA.

33.     On August 15, 2018, in Case No. 18-mj-4223-DHH, the Court issued a warrant

providing EPA with three years of access to the Property.  In January 2019, EPA's contractor

initiated Phase I of the agency's RI/FS work.  The RI/FS work performed during that initial

three-year access period included, among other things:

        a.      Site preparation, including the installation of new entrance gates and

perimeter fencing, the clearing of tree and vegetation, the connection of electrical/utility services,

snow removal, and the placement of signage;

        b.      Site setup, including placement on the Property of a temporary Site trailer,

equipment storage units, investigation derived waste collection containers, and work sanitation

facilities;

        c.      drilling for new groundwater wells and subsurface soil borings;

        d.      conducting Site surveys, including a wetlands delineation and geophysical

surveys;

        e.      conducting a historical Site evaluation;

        f.      installing new overburden and bedrock groundwater monitoring wells;

        g.      investigation of Site geology and fracture orientation, including bedrock

borehole geophysics; and

        h.      sampling sediment, surface water, pore water, groundwater, and soils, at

the surface and belowground.

      34.      On August 10, 2021, in Case No. 21-mj-4228-DHH, the Court issued a warrant

providing EPA with an additional two years of access, until August 10, 2023.  To date, the work

performed on and adjacent to the Property in that two-year warrant period includes, among other

things:

        a.      maintenance, including snow removal; landscaping; installation of

additional signage to deter trespassers and warn of the presence of hazardous materials and

conditions, supplementing existing signage or replacing signage that had been damaged or stolen; repairs to sections of perimeter fence, to maintain Site and Property security; sealing accessible openings in the structurally compromised former factory building; repairs to existing groundwater monitoring wells (e.g., caps, locks, and concrete road boxes), and disposal of hazardous and non-hazardous investigation-derived waste;

b.      drilling and installation of twelve new overburden and bedrock groundwater monitoring wells

c.      collection of subsurface soil borings from drilling operations for the analysis of VOCs;

d.      investigation of Site geology and fracture orientation, including the use of bedrock borehole geophysics to identify rock fracture zones that may be conveying contaminated groundwater;

e.      extensive high resolution site characterization, including the use of a membrane interface probe to identify subsurface areas of high VOC concentrations at depth and target the most appropriate new monitoring well locations;

f.      Re-collection of water samples and generation of new sampling data to replace those that had been invalidated due to the COVID-related laboratory staff shortages discussed above;

g.      field activities to support human health and ecological risk assessments, including installation of permanent soil-gas probes around an occupied commercial building and collection of soil-gas samples to assess the risk of vapor intrusion, and ecological habitat and value assessment characterizations of flora and fauna, to identify ecological species that may be at risk from contamination;

h.       performance of a temperature probe survey in Site wetlands and an on-Property stream, to identify locations of potential upwelling of contaminated groundwater into surface water by measuring water temperature differences between colder groundwater and warmer surface water; and

i.       coordination with private property owners to obtain critical data and information in areas abutting the Site and Property.

35.     In order to complete the RI/FS and commence RD activities, EPA now seeks three years of additional access.

36.     In order to complete the RI/FS, EPA must conduct additional activities on the Property, including:

a.       maintenance, including landscaping (e.g., tree and vegetation trimming and removal) as needed, perimeter fence repairs, replacement of stolen or damaged signage, and snow removal, as needed to keep the Property accessible and secure;

b.       continued placement of a field trailer, equipment storage units, waste collection containers, and worker sanitation facilities, until the RI/FS contractor completes all required work and fully demobilizes from the Site;

c.       collection of groundwater samples from twelve new monitoring wells, including two groundwater monitoring wells to replace previously damaged wells, five new overburden aquifer wells, and five new bedrock aquifer wells;

d.       collection of groundwater samples from twelve new monitoring wells to determine the nature and extent of contaminants, including VOCs, SVOCs, metals, alkalinity, nitrate/nitrite, sulfate, total organic carbon, sulfide, and 1,4-dioxane; and

e.      arranging for the transport and disposal off-site of waste, including hazardous and non-hazardous wastes.

37.      In order to commence the RD, EPA must conduct additional activities on the Property, including:

a.      mobilization by EPA's new RD contractor, which may include, e.g., placement of a temporary field trailer, equipment storage unit, waste collection containers, and worker sanitation facilities;

b.      periodic visits by EPA's new contractor to assess contamination and logistical issues;

c.      periodic maintenance (e.g., snowplowing, vegetation maintenance, fence repairs) to keep the Property accessible and secure;

d.      pre-design investigation or additional data collection, if required to support or supplement the RD, which may include additional hydrogeological investigations of groundwater or surface water, including monitoring well installation and development, pump tests, water level measurements, subsurface geophysics surveys, and water sampling, and collection of additional soil or sediment samples;

e.      treatability studies and pilot testing to evaluate potential remedial alternatives and treatment technologies; and

f.      arranging for the transport and disposal off-site of waste, including hazardous and non-hazardous wastes.

38.      Records indicate that, from 1977 to 1987, EPA gained access to the Site voluntarily, with the permission of Microfab, before the company filed for bankruptcy, to address potential violations of the Clean Water Act's National Pollution Discharge Elimination

System, 33 U.S.C. § 1342.  *See, e.g.,* Letter from David Fierra of EPA to Thomas Arena,

President, Microfab (7/16/1985) (cover letter for administrative order, referencing sampling

on-Site in May 1985) (Ex. K); EPA, Compliance Sampling Inspection, Microfab, Inc., NPDES

Permit No. MA0002208 (1983) (Ex. L) (listing inspection participants, including EPA and

Microfab).  But at least since 2014, despite extensive efforts, EPA has been unable to gain access

to the Property without assistance from the Court.

39.     On April 10, 2015, in Case No. 15-mj-4175-DHH, the United States applied *ex*

*parte* to this Court for an administrative warrant authorizing EPA to access the Property for

120 days, in order to determine whether there was release or potential release of hazardous

substances into the environment at or from the Site and whether the Site was eligible for

inclusion on the NPL.  In this application, the United States explained that the Property had been

abandoned and that, despite extensive efforts, EPA had been unable to locate anyone willing to

grant access on behalf of Microfab.

40.     On April 16, 2015, in Case No. 15-mj-4175-DHH, this Court granted the United

States' application.  That warrant allowed EPA to, among other things, gather and analyze soil,

sediment, and surface water samples necessary to make its initial assessment of environmental

conditions at the Site.  Based on that assessment, EPA determined that the Site should be added

to the NPL.

41.     In 2016 and 2017, EPA attorneys, enforcement coordinators, and I attempted to

identify owners and operators of the Site by conducting information and file reviews, and title

and corporate research.  I sent access request letters to a former President and a former Treasurer

of Microfab, both of whom responded that they had no ownership interest in Microfab and did

not have authority to grant EPA access to the Property.  I also sent access request letters to

former shareholders and officers of Semicon, Inc., which owned Microfab, and Microsemi Corp. (which at one point had an ownership interest in Semicon, Inc.), but all responded that they too did not have authority to grant EPA access to the Property.  *See* attached correspondence regarding unsuccessful attempts by EPA to gain access to the Site (Ex. M).

42.     Attached hereto are true and correct copies of documents describing the Site and its history, and documents related to EPA's unsuccessful efforts to gain access to the Property prior to seeking the Court's assistance.  See citations above.  Other, related files are available at https://www.epa.gov/superfund/microfab,

http://eeaonline.eea.state.ma.us/EEA/fileviewer/Rtn.aspx?rtn=3-0000201, and

https://www.amesburyma.gov/306/Microfab-Site-Information.

43.     On June 29, 2018, in Case No. 18-mj-4223-DHH, the United States applied *ex parte* to this Court for an administrative warrant authorizing EPA to access the Property for three years in order to perform a removal site evaluation, an RI/FS, and activities related thereto, under Sections 104(a), (b), and (e) of CERCLA, 42 U.S.C. §§ 9604(a), (b), and (e).  In its application, the United States explained that the Property had been abandoned and that, despite diligent efforts, EPA had been unable to locate anyone willing or able to grant access to the Property.  In support of that application, the United States submitted an earlier version of this affidavit.

44.     On August 15, 2018, in Case No. 18-mj-4223-DHH, this Court granted the United States' application and issued the requested warrant granting EPA access to the Property for three years, until August 15, 2021.

45.     On April 5, 2019, in Case No. 19-mj-4249-DHH, the United States applied *ex parte* to this Court for an administrative warrant authorizing EPA to access the Property for six months, within the previously granted three-year access period, to perform a removal action at

17

the Property, including activities different from those authorized under the August 15, 2018, warrant.

46.     On April 18, 2019, in Case No. 19-mj-4249-DHH, this Court granted the United States' application and issued the requested six-month warrant.

47.     On or about August 6, 2021, in Case No. 21-mj-4228-DHH, the United States applied *ex parte* to this Court for an administrative warrant authorizing EPA to access the Property for two years in order to complete its RI/FS, and activities related thereto, under Sections 104(a), (b), and (e) of CERCLA, 42 U.S.C. §§ 9604(a), (b), and (e).  In its application, the United States explained that the Property was still abandoned and that, despite diligent efforts, EPA still had been unable to locate anyone willing or able to grant access to the Property. In support of that application, the United States submitted an earlier version of this affidavit.  On August 10, 2023, this Court granted the United States' application and issued a warrant for two years of additional access, until August 10, 2023.

48.     As documented here and in the papers submitted with EPA's June 29, 2018, and August 10, 2021, warrant applications, EPA has attempted diligently to gain access to the Property voluntarily, to no avail.  Since that time, EPA knows of no change in the ownership status of the Property or any other relevant circumstances that would enable it to gain access to the Property voluntarily.  EPA performed an updated title search in June 2023 and found that Microfab, Inc., a dissolved corporation, is still listed as owner of the Property.  City of Amesbury, Assessor's Office, on-line property database, entry for "104 Haverhill Rd," currently available at http://gis.vgsi.com/amesburyma/Parcel.aspx?Pid=5180; JCW Title, Report and Title Update through June 22, 2023 (Ex. N).  To this day, EPA has been unable to identify any agents

or other representatives of Microfab, individuals or organizations with an ownership interest in the Property, or anyone else willing and able to grant access to the Property.

49.     Now, for the reasons discussed above, EPA seeks up to three years of additional time to access the Property to complete its RI/FS, including the investigation of Site conditions and determination of the nature and extent of remedial work that will be necessary to address the extensive contamination there, as described above, and to commence an RD.  I understand that this affidavit will be used to support an application for a warrant, under Section 104(e) of CERCLA, granting EPA authority to enter and have continued access to the Property to continue to perform an RI/FS, including the work listed in Paragraphs 36-37 above.  EPA, including its contractors and representatives, will perform these activities, as authorized by CERCLA, in order to determine whether releases or threatened releases of hazardous substances, pollutants or contaminants exist at the Site, the nature and extent of the contamination, and the necessity or appropriateness of taking further response action to protect public health or welfare, or the environment, from such releases or threatened releases.

50.     If the Court issues a warrant for access, EPA will use its best efforts to complete the RI/FS and commence the RD, as described in Paragraphs 36-37, promptly and diligently, in coordination with other appropriate federal and state agencies, including MassDEP.

51.     EPA cannot know precisely when the RI/FS and the RD will be completed.  EPA anticipates that further delays may occur due to a variety of circumstances outside of its control, such as inclement weather, accidents, vandalism, or pandemic.  I estimate that it will take approximately three years past the end of the current access period, until approximately August 10, 2026, to complete the remaining investigative activities described in Paragraphs 36-37, and

to commence an RD at the Site.  The elements of this anticipated RI/FS and RD work, and the

estimated duration of each element, are as follows:

| Component No. | Description | Est. Duration (Weeks) |
|---|---|---|
| 1 | Installation and pumping of 12 new wells, and collection of final groundwater samples for the RI | 5 |
| 2 | Laboratory analysis of groundwater samples | 6 |
| 3 | Data evaluation, including, *e.g.*, validation and review of collected data | 6 |
| 4 | Finish remainder of the RI and risk assessment reports | 14 |
| 5 | Evaluation of Remedial Alternatives | 10 |
| 6 | Draft remainder of the FS report and submit to EPA for comment.  EPA provides comments and contractor finalizes FS report, so Record of Decision can be prepared. | 20 |
| 7 | Contract and funding transition from RI/FS to RD.  EPA selects new Site contractor for the RD. | 32 |
| 8 | Pre-Design investigation, treatability Studies and Pilot Testing for the RD.  Site maintenance work. | 55 |
| 10 | Anticipated Delays (*see* ¶ 53) | 8 |
| | | |
| | TOTAL | 156 |

52.     Some of the tasks shown on the table above may overlap.  But, for the most part,

EPA will perform each component of the RI/FS and RD (listed by row in the table) serially, one

after the other.  So the total of 156 anticipated work weeks correspond to the three-year

extension of the access period requested by the United States (156 work weeks / 52 weeks per

year = 3 years).

53.     To complete an RI/FS and perform an RD, as is normally the case at Superfund

sites, EPA plans to rely on contractors with long-term contracts lasting the entire period of the

RI/FS and RD.  During that time, contractors will need frequent access to the Property in order to

perform investigative tasks, evaluate remedial alternatives, and conduct on-Site treatability

studies of potential clean-up technologies.  These contractors must have uninterrupted access to

the Property so they can meet their contractual obligations and so EPA can meet its remedial milestones in a manner that protects human health and the environment.  EPA anticipates that further delays may occur due to a variety of unforeseen circumstances, such as inclement weather, accidents, and vandalism.  This possibility is reflected in Component No. 10 of the Paragraph 51 timetable.

54.    If the results of the extended RI/FS investigations and studies confirm that a remedial action is necessary (which EPA expects based on data and information collected thus far), EPA may need access to the Property for additional time to perform this cleanup work.  In that case, EPA may seek a further extension of the access warrant or other appropriate order allowing the agency to access the Property to conduct the selected remedial activities.  Thus, while the United States knows now that EPA needs at least three more years to complete the RI/FS and commence an RD, it is not currently seeking additional time to complete the RD or perform a remedial action ("RA"), unless and until it determines what steps are needed to complete the RD, has enough information to estimate the time frame for doing so, confirms that an RA is necessary based on the results of the completed RI/FS, and determines the nature and extent of the remaining RD activities and anticipated RA.

55.    To my knowledge, this application for a three-year extension of the warrant for access to the Property is not contested by any party.  On the contrary, key stakeholders, including MassDEP, the City of Amesbury, and residents and businesses located near the Property all support EPA's efforts to investigate and clean up hazardous substances at this abandoned industrial property within the anticipated time frame.

56.     A contractor is currently conducting ongoing, critical remedial field investigation work at the Site.  EPA needs the Court to approve and sign the requested access warrant granting additional time for EPA to continue and complete its RI/FS work, and to perform RD work, on the Property before the current access warrant expires on August 10, 2023.  This extension is necessary to avoid significant additional delays and costs in the RI/FS, RD, and other important remedial work at the Site, and associated increases in risk to human health and the environment.

57.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  August 7, 2023

_____
Lisa Thuot
Remedial Project Manager
Region 1, U.S. EPA

Sworn to before me by telephone in accordance with Fed. R. Crim. P. 4.1 this 9th day of August, 2023 at 3:36 p.m.

David H. Hennessy
U.S. Magistrate Judge
District of Massachusetts